UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

WILLIAM UNDERWOOD,

Defendant.

88 Cr. 822 (SHS)

---

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
THE DEFENDANT'S MOTION TO REDUCE SENTENCE
<u>PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)</u>**

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Kaylan E. Lasky
Assistant United States Attorney
        *Of Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii-v

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .................................................................................................................. 1

I.    Factual Background ............................................................................................... 1

    A.    Underlying Conduct, Conviction and Sentence ..................................... 1

    B.    Procedural History ...................................................................................... 4

    C.    Compassionate Release Motion ............................................................... 6

II.   Legal Standards ....................................................................................................... 6

    A.    Compassionate Release .............................................................................. 6

    B.    The First Step Act ....................................................................................... 8

ARGUMENT ........................................................................................................................ 9

III.  Rehabilitation is Not an "Extraordinary and Compelling" Reason for
    Compassionate Release ......................................................................................... 9

IV.   COVID-19 is Not an "Extraordinary and Compelling" Reason for
    Compassionate Release, and the Defendant Has Not Exhausted His
    Administrative Remedies ...................................................................................... 14

    A.    Underwood Has Not Exhausted His Administrative
        Remedies ..................................................................................................... 14

    B.    The Defendant is Not at Substantially Greater Risk of
        Contracting COVID-19 at FCI Fairton ................................................. 18

V.    The Defendant's Sentencing Arguments Are Unavailing ............................... 22

VI.   The Defendant Remains a Danger to the Community ..................................... 23

VII.  Section 3553(a) Counsels Strongly Against Any Reduction in Sentence ........ 25

CONCLUSION .................................................................................................................... 26

# TABLE OF AUTHORITIES

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)........................................................................5, 22

*Bastek v. Fed. Crop. Ins.*, 145 F.3d 90 (2d Cir. 1998)....................................................15

*Blakely v. Washington*, 542 U.S. 296 (2004)..................................................................5

*Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017)........................................15

*Dillon v. United States*, 560 U.S. 817 (2010) ...............................................................8

*Green v. United States*, 397 F.3d 101 (2d Cir. 2005) ...................................................22

*Guzman v. United States*, 404 F.3d 139 (2d Cir. 2005) ................................................22

*People v. Sweeper*, 471 N.Y.S.2d 486 (Sup. Ct. N.Y. Cnty. 1984)............................. 2-4

*Ross v. Blake*, 136 S. Ct. 1850 (2016) ..........................................................................15

*Underwood v. Hogsten*, 251 F. App'x 770 (3d Cir. 2007) .............................................5

*Underwood v. Hogsten*, 553 U.S. 1044 (2008)..............................................................5

*Underwood v. United States*, 15 F.3d 16 (2d Cir. 1993) ...............................................5

*Underwood v. United States*, 166 F.3d 84 (2d Cir. 1999) .............................................5

*Underwood v. United States*, 502 U.S. 942 (1991)........................................................5

*Underwood v. United States*, 88 Cr. 822 (MGC), 1993 WL 59401 (S.D.N.Y. Mar. 3, 1993) ........5

*Underwood v. United States*, 88 Cr. 822 (MGC), 2006 WL 704478 (S.D.N.Y. Mar. 20, 2006) ....5

*Underwood v. United States*, No. 97-3592 (2d Cir. Sept. 3, 1997) .................................5

*United States v. Applins*, 637 F.3d 59 (2d Cir. 2011) ...................................................23

*United States v. Booker*, 13 Cr. 00050, 2020 WL 830054 (N.D. Ohio Feb. 20, 2020) ................11

*United States v. Booker*, 543 U.S. 220 (2005) ..........................................................5, 22

*United States v. Butler*, 18 Cr. 834 (PAE) 2020 WL 1689778, (S.D.N.Y. Apr. 7, 2020) ............25

*United States v. Butler*, 970 F.2d 1017 (2d Cir. 1992) ..................................................8

*United States v. Cantu-Rivera*, No. Cr. H-89-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019) ................................................................................................................11

*United States v. Carver*, 19 Cr. 6044, 2020 WL 1604968 (E.D. Wa. Apr. 1, 2020) ....................16

*United States v. Clark*, 17 Cr. 85 (SDD), 2020 WL 1557397 (M.D. La. Apr. 1, 2020)................16

*United States v. Cohen*, 18 Cr. 602 (WHP), 2020 WL 1428778 (S.D.N.Y. Mar. 24, 2020).........16

*United States v. Colvin*, 19 Cr. 179 (JBA), 2020 WL 1613943 (D. Conn. Apr. 2, 2020) .............16

*United States v. Credidio*, 19 Cr. 111 (PAE) (S.D.N.Y. March 30, 2020)...................................26

*United States v. Ebbers*, 02 Cr. 11443 (VEC), 2020 WL 91399 (S.D.N.Y. Jan. 8, 2020) .......... 8-9

*United States v. Eberhart*, 13 Cr. 313 (PJH), 2020 WL 1450745 (N.D. Cal. Mar. 25, 2020).......16

*United States v. Engles*, 790 F. App'x 961 (10th Cir. 2020) .........................................................10

*United States v. Engleson*, 13 Cr. 340 (RJS), 2020 WL 1821797 (S.D.N.Y. Apr. 10, 2020) .......16

*United States v. Garza*, 18 Cr. 1745, 2020 WL 1485782 (S.D. Cal. Mar. 27, 2020) ...................16

*United States v. Gentille*, 19 Cr. 590 (KPF), 2020 WL 1814158 (S.D.N.Y. Apr. 9, 2020) ..........16

*United States v. Gileno*, 19 Cr. 161, 2020 WL 1307108 (D. Conn. Mar. 19, 2020) ....................16

*United States v. Gotti*, 02 Cr. 743 (CM), 2020 WL 497987 (S.D.N.Y. Jan. 15, 2020) .................8

*United States v. Haney*, 19 Cr. 541 (JSR), 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020)......16, 20

*United States v. Hernandez*, 18 Cr. 834 (PAE), 2020 WL 1445851 (S.D.N.Y. Mar. 25, 2020) ...16

*United States v. Israel*, 05 Cr. 1039 (CM), 2019 WL 6702522 (S.D.N.Y. Dec. 9, 2019)............25

*United States v. Lisi*, 15 Cr. 457 (KPF), 2020 WL 881994, (S.D.N.Y. Feb. 24, 2020), *recons. denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020) ................................................. 9-10, 22, 25

*United States v. Martin*, 18 Cr. 834 (PAE) (S.D.N.Y. April 10, 2020) ........................................25

*United States v. Millan*, 91 Cr. 685 (LAP), 2020 WL 1674058 (S.D.N.Y. Apr. 6, 2020) ............11

*United States v. Monzon*, 99 Cr. 157 (DLC), 2020 WL 550220 (S.D.N.Y. Feb. 4, 2020)............16

*United States v. Nwankwo*, 12 Cr. 31 (VM), 2020 WL 2490044 (S.D.N.Y. May 14, 2020) ........10

*United States v. Ogarro*, 18 Cr. 373 (RJS) (S.D.N.Y. Apr. 14, 2020) ..........................................16

*United States v. Perez*, 17 Cr. 513 (AT), 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020) ...............16

*United States v. Raia*, 954 F.3d 594 (3d Cir. 2020)....................................................................16

*United States v. Ramos*, 14 CR. 484 (LGS), 2020 WL 1685812 (S.D.N.Y. Apr. 7, 2020)...........16

*United States v. Rivernider*, 10 Cr. 222 (RNC), 2020 WL 597393 (D. Conn. Feb. 7, 2020)........22

*United States v. Sanchez*, 08 Cr. 789 (RJS), 2020 WL 2571074 (S.D.N.Y. May 21, 2020).........10

*United States v. Underwood*, 932 F.2d 1049 (2d Cir. 1991) ................................................1, 4, 24

*United States v. Weeks*, 16 Cr. 167 (LAP), 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020).....10, 20

*United States v. Wieber*, 14 Cr. 74, 2020 WL 1492907 (W.D. Ky. Mar. 27, 2020).....................10

*United States v. Williams*, 06 Cr. 0143, 2020 WL 614807 (D. Minn. Feb. 10, 2020)..................11

*United States v. Williams*, 15 Cr. 646, 2020 WL 1506222 (D. Md. Mar. 30, 2020) ....................16

*United States v. Woodson*, 18 Cr. 845 (PKC), 2020 WL 1673253 (S.D.N.Y. Apr. 6, 2020)........16

*United States v. Zullo*, 09 Cr. 64, 2019 WL 7562406 (D. Vt. Sept. 23, 2019) .............................11

*United States v. Zywotko*, 19 Cr. 113, 2020 WL 1492900 (M.D. Fla. Mar. 27, 2020).................16

*United States, v. Roberts*, 18 Cr. 528 (JMF), 2020 WL 1700032 (S.D.N.Y. Apr. 8, 2020)..........16

Rules:

18 U.S.C. § 1961...........................................................................................................................1

18 U.S.C. § 1962...........................................................................................................................1

18 U.S.C. § 1963...........................................................................................................................1

18 U.S.C. § 3142(g) ..............................................................................................................1, 7, 9, 23

18 U.S.C. § 3553(a) ............................................................................................................... passim

18 U.S.C. § 3582(d) .....................................................................................................................17

18 U.S.C. § 3582(c)(1)(A) ..................................................................................................... passim

21 U.S.C. § 846.............................................................................................................................1

21 U.S.C. § 848.................................................................................................................1

28 U.S.C. § 2241.............................................................................................................5

28 U.S.C. § 2244.............................................................................................................5

28 U.S.C. § 994(t)....................................................................................................7-8, 10-11

28 U.S.C. § 2255.............................................................................................................5

Federal Rule of Civil Procedure 60(b).............................................................................5

U.S.S.G. § 1B1.13...................................................................................................7-11, 22

## PRELIMINARY STATEMENT

William Underwood ("Underwood") brings this motion (the "Motion") pursuant to 18 U.S.C. § 3582(c)(1)(A) for a reduction in his sentence to time served. The Court should swiftly reject the Motion. In short, Underwood presents no extraordinary and compelling reasons justifying release, poses a danger to the safety of the community under 18 U.S.C. § 3142(g), and the factors set forth in 18 U.S.C. § 3553(a) cut strongly against his early release.

## BACKGROUND

### I.  Factual Background

#### A.      Underlying Conduct, Conviction and Sentence

In 1990, Underwood was convicted after a jury trial before the Honorable Miriam G. Cederbaum for conducting or participating in a racketeering enterprise ("RICO"), in violation of 18 U.S.C. §§ 1961 and 1962(c); a RICO conspiracy, in violation of 18 U.S.C. §§ 1962 and 1963; a narcotics conspiracy, in violation of 21 U.S.C. § 846; and participating in a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848. (Pre-Sentence Report dated Mar. 30, 1990 ("PSR") ¶¶ 5-8). Since Judge Cederbaum found that Underwood's criminal activities extended beyond November 1, 1987, the effective date of the Sentencing Guidelines, Underwood was sentenced under the Sentencing Guidelines. (*Id.* ¶ 4). Judge Cederbaum imposed a sentence of mandatory life imprisonment on the CCE, and concurrent terms of 20 years each on the remaining counts. (Sentencing Transcript, Def's "Ex. R," ECF No. 186-18, Tr. 27:4-6).

At trial, the Government's evidence showed that "from the 1970s until his arrest in late 1988, Underwood supervised and controlled an extensive and extremely violent narcotics trafficking operation," known as the Vigilantes, "involving a number of murders and conspiracies to murder." *United States v. Underwood*, 932 F.2d 1049, 1051 (2d Cir. 1991); *see also* PSR ¶ 11 (similar, and also indicating that Underwood himself formed the Vigilantes). This sophisticated enterprise involved the street-level distribution of heroin in West Harlem, retail operations in other areas of New York City, and wholesale consignment to other distributers. (PSR ¶ 11). During the

1980s, Underwood began importing large quantities of heroin from Europe to the United States. (*Id.*) At Underwood's direction, the Vigilantes killed to protect and in furtherance of the organization, as described in more detail below. (*Id.*). *See also People v. Sweeper*, 471 N.Y.S.2d 486, 490 (Sup. Ct. N.Y. Cnty. 1984) (The Vigilantes organization "sells heroin stamped with the brand name Vigilante and also commits narcotics-related homicides. . . . The leader of the Vigilantes is one William Underwood.").

Underwood was the "overall leader" of the Vigilantes, which included more than approximately 40 individuals over the course of its operation and was highly hierarchical. (PSR ¶ 12; *see also id.* ¶¶ 5, 26 (referring to Underwood as "Chief" and "the big man")). Underwood evaded law enforcement for nearly two decades because he was careful and ordered others to do his "dirty work," rather than doing it himself; he took pains to insulate himself from law enforcement scrutiny, for example, by not himself engaging in street sales or liaising with lower level members of his organization. (*Id.* ¶ 17).

Underwood's narcotics enterprise was highly successful. For example, the evidence adduced at trial indicated that, from approximately 1980 to 1982, the Vigilantes sold between approximately 3 to 5.5 kilograms of diluted heroin per week. (*Id.* ¶¶ 21, 30). As additional data points, it was estimated that a TWA flight attendant who worked for Underwood transported, on average, approximately $50,000 to $60,000 in cash from the United States to Underwood's narcotics source in Europe; the TWA flight attendant also smuggled the equivalent of approximately 750 to 900 grams of heroin per trip from Europe to the United States for Underwood on approximately twenty occasions. (*Id.* ¶¶ 28, 32).

The Vigilantes' success can be attributed in part to its members' ruthlessness: they murdered in order to "among other things, eliminate[e] and intimidate[e] competitors, informants,

and actual or potential witnesses."[1] (*Id.* ¶ 11). The evidence at trial included five murders and one attempted murder which were committed at Underwood's instructions:[2]

i.  Murder #1: On April 3, 1975, Underwood accused a man of "running (his) mouth" about another individual's murder. (*Id.* ¶¶ 33-34). After a short argument, Underwood shot the man in the face. (*Id.* ¶ 34). Uncertain whether the man was dead, Underwood sent in two Vigilante members, one of whom killed the man by shooting him in the head using Underwood's derringer. (*Id.*)

ii.  Murder #2: Underwood ordered the murder of a rival drug dealer, who had previously shot Underwood in the arm, in order to avenge the shooting and eliminate a competitor. (*Id.* ¶ 35). On September 21, 1975, two Vigilante members shot the man in his apartment, and the man died. (*Id.* ¶ 36). That night, Underwood instructed one of the two Vigilante members about how he should lie to law enforcement, which the Vigilante member did. (*Id.* ¶ 37).

iii.  Murder #3: Underwood ordered members of the Vigilantes to murder a rival drug dealer as soon as possible. (*Id.* ¶ 39). When the Vigilantes were unable to locate the man, Underwood ordered them to kill the man's brother instead. (*Id.*) On September 5, 1979, members of the Vigilantes ambushed the brother as he exited his apartment complex and shot him to death. (*Id.*).

iv.  Attempted Murder #1: Underwood did not rescind his order regarding the rival drug dealer described above in paragraph (iii). (*Id.* ¶ 40). Accordingly, *subsequent* to that murder, also in fall 1979, members of the Vigilantes attempted to murder the rival drug dealer in a shoot-out, after they located him outside a Harlem nightclub. (*Id.*). The victim was wounded but survived. (*Id.*)

v.  Murder #4: Underwood directed members of the Vigilantes to murder a former Vigilante member upon that former member's release from prison because Underwood learned that the former member had cooperated with prosecuting authorities. (*Id.* ¶¶ 42-44). Underwood issued repeated orders that a specific lieutenant should kill the man. (*Id.* ¶¶ 43-44). On December 11, 1981, four Vigilantes members approached the man on a street corner and began discussing a recent shootout between the man's bodyguard and one of Underwood's lieutenants.

---

[1] *See also* PSR ¶ 18 (stating that Underwood gave his closest associates hatchet necklaces, which, in addition to symbolizing "loyalty" and "unity," signified that, should the wearer betray Underwood, that individual's "head would be on the chopping block"); *Sweeper*, 471 N.Y.S.2d at 490 (describing Vigilantes "policy, known to its members as well as others, called 'process elimination,'" entailing "kill[ing] potential witnesses who cooperate with the police against them").

[2] The acts of violence described above are only those for which evidence was presented at Underwood's trial. *See, e.g.*, *Sweeper*, 471 N.Y.S.2d at 490 ("Fifteen homicide investigations in which Vigilante members are suspects are presently in progress. Eight known Vigilantes are under indictment for murder.").

(*Id.* ¶ 45). Mid-conversation, three of the Vigilantes began shooting at the man, who was killed.[3] (*Id.* ¶ 45).

vi.   Murder #5: In 1983, one of Underwood's lieutenants was arrested and charged with a murder by the Manhattan District Attorney's Office. (*Id.* ¶ 48). On November 14, 1983, the prosecution disclosed the name of its eyewitnesses to that murder, including a vulnerable heroin addict who was to be its principal witness.[4] (*Id.* ¶¶ 48-52). Upon learning of the eyewitness's identity that evening, Underwood ordered a Vigilante member to murder the eyewitness. (*Id.* ¶ 49). Shortly thereafter, that Vigilante member shot the victim twice in the head, killing him. (*Id.* ¶ 50). Underwood subsequently provided the Vigilante member with cash and instructions regarding how to lie to law enforcement, which the member did.[5] (*Id.* ¶¶ 51-52).

From approximately the late 1970s through the time of his arrest–while Underwood was running the Vigilantes–he also had success in the music industry as a promoter and manager. (*Id.* ¶¶ 132-40). Underwood traveled extensively, including in Europe, purportedly in support of his music business. (*Id.* ¶ 151). Underwood frequently traveled to Europe between 1981–approximately when he first developed his European narcotics connections–and his arrest in 1988. (*Id.* ¶¶ 11, 151). Although Underwood represented that he traveled to Europe for record company conventions and to recruit new talent, he assumed all travel expenses and never consummated any European contracts. (*Id.* ¶ 151-52).

## B.   Procedural History

Following his conviction, Underwood filed an appeal with the U.S. Court of Appeals for the Second Circuit, which affirmed his conviction and sentence on May 9, 1991. *United States v.*

---

[3] Two of the shooters were convicted of the murder after trial in New York Supreme Court, and the third shooter was convicted of possession of a weapon but acquitted of murder. (PSR ¶ 47).

[4] *See Sweeper*, 471 N.Y.S.2d at 491 (describing victim as a "destitute and dying heroin addict" and a "poor heroin addict with no known enemies," and his murder as an "execution"). The victim was a "steerer" (or "touter") within the Vigilantes organization. (PSR ¶ 49). The Vigilantes used "steerers," who were heroin addicts, to act as intermediaries between street sellers and customers and to test diluted heroin's potency by injecting samples, in exchange for narcotics. (*Id.* ¶¶ 13-14).

[5] Three Vigilante members served State prison sentences in connection with this murder. (*Id.* ¶ 50).

*Underwood*, 932 F.2d 1049 (2d Cir. 1991). Underwood's petition for a *writ of certiorari* with the U.S. Supreme Court was denied on November 4, 1991. *Underwood v. United States*, 502 U.S. 942 (1991).

In 1992, Underwood filed a motion pursuant to 28 U.S.C. § 2255 to have his Sentencing Guidelines sentence vacated and to be resentenced under pre-Sentencing Guidelines law; Judge Cederbaum denied the motion on March 3, 1993. *Underwood v. United States*, 92 Cv. 4255 (MGC), 88 Cr. 822 (MGC), 1993 WL 59401 (S.D.N.Y. Mar. 3, 1993). The Second Circuit affirmed the denial on December 20, 1993. *Underwood v. United States*, 15 F.3d 16 (2d Cir. 1993).

In 1997, Underwood filed an application to file a second motion pursuant to 28 U.S.C. § 2255, which was denied on September 3, 1997. *Underwood v. United States*, No. 97-3592 (2d Cir. Sept. 3, 1997). Upon *sua sponte* reconsideration, the petition was again denied on January 22, 1999. *Underwood v. United States*, 166 F.3d 84, 88 (2d Cir. 1999).

In 2002, 2003 and 2005, Underwood filed unsuccessful applications to the Second Circuit for filing authorization under 28 U.S.C. § 2244, arguing that his sentence should be vacated under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005). *See Underwood v. United States*, 88 Cr. 822 (MGC), 2006 WL 704478, at *1 (S.D.N.Y. Mar. 20, 2006) (describing 2002, 2003, and 2005 habeas petitions). In 2003 and 2005, Underwood presented similar arguments in motions pursuant to Federal Rule of Civil Procedure 60(b), both of which Judge Cederbaum denied. *United States v. Underwood*, 88 Cr. 822 (MGC), (ECF No. 170) (denying 2003 motion); *Underwood v. United States*, 88 Cr. 822 (MGC), 2006 WL 704478, at *1 (S.D.N.Y. Mar. 20, 2006) (ECF No. 176) (denying 2005 motion). *See also Underwood v. Hogsten*, 251 F. App'x 770 (3d Cir. 2007) (affirming dismissal of petition filed pursuant to 28 U.S.C. § 2241); *cert. denied Underwood v. Hogsten*, 553 U.S. 1044 (2008).

### C.    Compassionate Release Motion

On May 12, 2020, Underwood moved this Court to reduce his life sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A). The Motion's principle argument is that Underwood is rehabilitated. (Mot. at 1; *see also id.* at 3-7, 13). Underwood also asserts that a sentence reduction is appropriate because he might not have received a life sentence under current law and in light of the COVID-19 pandemic. (*Id.* at 14-20).

Approximately a year before filing the instant motion–and prior to the COVID-19 outbreak–Underwood submitted a July 24, 2019 request to the warden of FCI Fairton, where he is incarcerated, asking that the Federal Bureau of Prisons ("BOP") file a motion for a sentence reduction on Underwood's behalf. (BOP Petition, Def's "Ex. S," ECF No. 186-19). Underwood's submission to the warden asserts that a sentence reduction would be appropriate "based on his age, the time he has served and the 'extraordinary and compelling reasons,'" namely, rehabilitation and sentencing arguments similar to those in the instant Motion.[6] (*Id.* at 11). Underwood's request was denied (on August 2, 2019), as was his September 3, 2019 Regional Administrative Remedy Appeal (on October 4, 2019), and his November 8, 2019 Central Office Administrative Remedy Appeal (on January 14, 2020). (*Id.*)

## II. Legal Standards

### A.  Compassionate Release

The "compassionate release" statute, passed in 1984 and codified at 18 U.S.C. § 3582(c), provides limited circumstances under which a court may "modify a term of imprisonment once it has been imposed." Underwood is moving solely pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), which provides that a court may modify a sentence, after considering the factors set forth in § 3553(a) to

---

[6] In his petition to the BOP, Underwood states, in passing, that he suffers from "'degenerative disc erosion' in his back." (Ex. S at 12). As Underwood's Motion does not contain any reference to this condition, it is not discussed herein.

the extent that they are applicable, if the defendant can show that "extraordinary and compelling reasons warrant such a reduction," and that the reduction "is consistent with applicable policy statements issued by the Sentencing Commission."

Congress instructed the United States Sentencing Commission (the "Sentencing Commission") to "describe what should be considered extraordinary and compelling reasons for sentence reduction [under the compassionate release statute], including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). Congress included a specific instruction to the Sentencing Commission that is critical here: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id.*

Consistent with Congress's mandate, the Sentencing Commission issued a policy statement and accompanying application notes under U.S.S.G. § 1B1.13. That policy statement provides that the Court may, after considering the § 3553(a) factors, reduce an imprisonment term if "extraordinary and compelling reasons warrant the reduction," *id.* § 1B1.13(1)(A); "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)," *id.* § 1B1.13(2); and "the reduction is consistent with this policy statement," *id.* § 1B1.13(3). As relevant here, the accompanying application notes provide that "extraordinary and compelling reasons" exist under four circumstances:

> A. the defendant has a serious medical condition, such as a terminal illness,
>
> B. the defendant is at least 65 years old and certain other conditions are met, including "a serious deterioration in physical or mental health because of the aging process";
>
> C. the defendant's family circumstances have changed such that the defendant is the only available caregiver for a minor child or incapacitated spouse; or
>
> D. "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."

U.S.S.G. § 1B1.13 app. note 1. Underwood does not fit the criterion for application notes (A), (B), or (C), and does not argue that he meets any of those requirements. Rather, Underwood brings his argument solely under the catchall provision set forth in note (D).

With respect to rehabilitation, the application notes reinforce Congress's statement on the issue: "Pursuant to 28 U.S.C. § 994(t), *rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason* for purposes of this policy statement." U.S.S.G. § 1B1.13 app. note 3 (emphasis added). Because the governing statute requires that a ruling concerning compassionate release be "consistent with applicable policy statements issued by the Sentencing Commission," 18 U.S.C. § 3582(c)(1)(A), U.S.S.G. § 1B1.13 is binding on the Court. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010) (where Section 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).

As the moving party, the defendant bears the burden of proving that "extraordinary and compelling reasons" exist. " *United States v. Gotti*, 02 Cr. 743 (CM), 2020 WL 497987, at *5 (S.D.N.Y. Jan. 15, 2020); *United States v. Ebbers*, 02 Cr. 11443 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020); *see generally United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

### B.  The First Step Act

In December 2018, as part of the First Step Act, Congress relaxed the requirement of a BOP motion to trigger judicial consideration of a request for compassionate release under Section 3582(c)(1)(A). Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (2018). As revised, Section 3582(c)(1)(A) requires a motion by *either* the Director of the Bureau of Prisons *or* the defendant, after "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau

of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* In short, if the BOP refuses or fails to respond to a defendant's request for compassionate release, then the defendant can take his or her request directly to the court. The Sentencing Commission has not yet amended U.S.S.G. § 1B1.13 to reflect this statutory change.

Contrary to Underwood's position, the First Step Act does *not* provide an end-run around the substantive standards for granting compassionate release; it does not revise any of the grounds for granting such petitions or redefine the phrase "extraordinary and compelling." *See Ebbers,* 02 Cr. 11443 (VEC), 2020 WL 91399, at *4. Indeed, "there is no indication in the [statute's] text or the [Sentencing Commission's] policy statements that the identity of the movant should affect the meaning of the phrase 'extraordinary and compelling reasons.'" *Id.*; *see also United States v. Lisi*, 15 Cr. 457 (KPF), 2020 WL 881994, at *4 (S.D.N.Y. Feb. 24, 2020), *recons. denied*, 2020 WL 1331955 (S.D.N.Y. Mar. 23, 2020).

## ARGUMENT

Underwood's Motion fails because he has not met his burden to demonstrate compelling and extraordinary circumstances warranting immediate release; he has failed to exhaust his administrative remedies with respect to his COVID-19 argument; and, given the seriousness of Underwood's violent crimes, the factors set forth in 18 U.S.C. § 3142(g) and 18 U.S.C. § 3553(a) weigh against reducing his sentence.

### III. Rehabilitation is Not an "Extraordinary and Compelling" Reason for Compassionate Release

The crux of Underwood's Motion, that he has been fully rehabilitated, fails because an inmate's rehabilitation cannot constitute an "extraordinary and compelling reason," as a matter of law. In addition, Underwood's claim to have been fully rehabilitation is undermined by his failure

to squarely address that, in addition to harmful drugs, he and his organization perpetuated years of violence in the community.

Underwood asserts that he deserves a sentence reduction because he is a "model inmate, a mentor, [and] a devoted family-man" who "no longer poses a threat to society," "takes responsibility for his serious crimes," and has already served over thirty-one years in prison. (Mot. at 1; *see also id.* at 3-7, 13). However, Directives from Congress, the Sentencing Commission, and the courts bar Underwood's rehabilitation argument as a matter of law. Congress has directed by statue that, "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). The Sentencing Commission's binding policy note similarly states that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13 app. note 3. And courts are in agreement. *See, e.g.*, *United States v. Sanchez*, 08 Cr. 789 (RJS), 2020 WL 2571074, at *2 (S.D.N.Y. May 21, 2020) (denying compassionate release motion based on "purported rehabilitation"); *United States v. Nwankwo*, 12 Cr. 31 (VM), 2020 WL 2490044, at *1 (S.D.N.Y. May 14, 2020), (rejecting defendant's argument that his rehabilitation presented an "extraordinary and compelling" reason, based on application note three); *United States v. Weeks*, 16 Cr. 167 (LAP), 2020 WL 1862634, at *3 (S.D.N.Y. Apr. 14, 2020), (finding defendant's rehabilitation efforts, however "admirable," "are not grounds for release," based on application note three); *Lisi*, 15 Cr. 457 (KPF), 2020 WL 881994, at *4 (rejecting defendant's argument that his rehabilitation was an "extraordinary and compelling" reason, based on application note three); *United States v. Engles*, 790 F. App'x 961, 962 (10th Cir. 2020) (rejecting same argument, writing "[a]s to Defendant's post-sentencing rehabilitation efforts, the United States Sentencing Guidelines explicitly state 'rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason' for a sentence reduction'"); *United States v. Wieber*, 14 Cr. 74, 2020 WL 1492907, at *3 (W.D. Ky. Mar. 27, 2020) (rejecting same argument, and noting that "since the passage of the First

Step Act, district courts around the country have continued to deny motions for release based solely on the rehabilitation of the defendant)"; *United States v. Williams*, 06 Cr. 0143, 2020 WL 614807, at *2 (D. Minn. Feb. 10, 2020) (denying compassionate release because defendant's reasons "largely pertain to his rehabilitation while in prison, which both Congress and the [Sentencing] Commission have expressly excluded from the definition of 'extraordinary and compelling reasons'"); *United States v. Booker*, 13 Cr. 00050, 2020 WL 830054, at *2 (N.D. Ohio Feb. 20, 2020) (rejecting same argument because "'rehabilitation of the defendant alone' cannot serve as the basis for compassionate release"); *United States v. Zullo*, 09 Cr. 64, 2019 WL 7562406, at *3 (D. Vt. Sept. 23, 2019) (rejecting the same argument–even though the rehabilitation was "very successful"–because "rehabilitation is specifically excluded as an independent basis for compassionate release").

Underwood cites only two decisions that have reached a different result. The court in *United States v. Millan*, 91 Cr. 685 (LAP), 2020 WL 1674058, at *15 (S.D.N.Y. Apr. 6, 2020) granted the compassionate release of a non-violent defendant on the basis of that defendant's rehabilitation. Significantly, in finding that the defendant had been rehabilitated, Judge Preska emphasized that the defendant was a "non-violent, first-time offender" who committed drug-trafficking crimes as an "immature and irresponsible" youth.[7] *Id.* at *8; *see also id.* at *2. ("Mr. Millan's PSR contains no assertion or allegation that he (or anyone else associated with the [drug trafficking] organization) ever engaged in any acts of violence or trafficked in/used any weapons."). In *United States v. Cantu-Rivera*, No. Cr. H-89-204, 2019 WL 2578272, at *1-2 (S.D. Tex. June 24, 2019), also cited by Underwood, the court found that the defendant's "extraordinary degree of rehabilitation" and subsequent sentencing changes effected by the First Step Act

---

[7] In addition, the *Millan* court does not discuss the Sentencing Commission's binding policy guidance, U.S.S.G. § 1B1.13 app. note 3, or any of the cases cited in the above list.

warranted compassionate release. There too, the defendant was a non-violent drug offender. In contrast, as shown at trial, Underwood was the long-time boss of a violent organization and ruthlessly ordered the murders of numerous people. Furthermore, the Government respectfully maintains that these decisions were incorrectly decided, and their acceptance of rehabilitation as the basis for compassionate release contradicts a Congressional directive, binding guidance from the Sentencing Commission, and the cases within this District and from all over the country cited above.

While rehabilitation is certainly a relevant factor–an otherwise eligible defendant would properly be denied release based on a lack of rehabilitation–Congress's obvious conclusion that rehabilitation has some relevance to compassionate release does not weaken its plain directive: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). As described in sections IV and V below, Underwood's bases for compassionate release other than rehabilitation are entirely unavailing—either standing alone or considered together in conjunction with his rehabilitation argument. Since Underwood's rehabilitation argument cannot stand alone, he has failed to demonstrate an extraordinary and compelling reason justifying early release.

Even if Underwood's rehabilitation could stand alone (to be clear, it legally cannot), his rehabilitation efforts are lacking in essential ways. Underwood cites, among other things, to his mentorship of younger inmates, the unflagging support he has provided to and received from his family, and his educational and disciplinary records while incarcerated, all of which are commendable. Yet, absent from Underwood's submissions are any indication he has meaningfully acknowledged the true scope of his crimes. To the Government's knowledge, Underwood has never publicly done so, and in the instant motion he elides the murderous nature of the organization that he was convicted of running.

Crucially, Underwood does not so much as mention the murder victims or others whose lives were devastated by the drugs that his organization distributed. While Underwood expresses regret for the consequences for himself and his loved ones, and, in a generalized sense, for the community, none of his concern is directed toward the victims or the victims' families. (Underwood Letter, Def's "Ex. I," ECF No. 186-9, at 2-3, 5) ("I have deep remorse in my heart for the pain that I have caused *my children, my family and my community*"; "My deepest regret is forfeiting those personal moments in life with *my children*") (emphasis added). Underwood's refusal to acknowledge the blood on his hands, or to express true remorse for the many people whose deaths he caused, undermines his claims of contrition and rehabilitation.

Underwood also minimizes his criminal conduct and his role in the Vigilantes organization. (*Id.* at 2-3) (for example, referring to "the mistakes from my younger self," and describing himself as "one among many leaders"). At the time of his arrest, Underwood was 34 years old and had been the "overall leader" of the Vigilantes, which he formed, for approximately seventeen years. (PSR ¶¶ 11-12; *see also id.* ¶ 5, 26). Relatedly, Underwood inaccurately represents that his criminal conduct had lessened by the time of his arrest. (*Id.*). The evidence at trial indicated that Underwood persisted in his criminal career even as he began to succeed in the music business, and that, in fact, his legitimate business provided a front for extensive travel to Europe, enabling him to facilitate his narcotics enterprise. (*Id.* ¶¶ 11, 151-52).

It is clear that a great deal of the support that Underwood has engendered for his Motion is premised on the misimpression that Underwood's conduct was non-violent. To the contrary, Underwood ran a violent enterprise, and he was shown at trial by overwhelming evidence to have expressly, and brutally, ordered multiple murders, which were carried out at his direction by his underlings. His supporters' confusion is perhaps unsurprising given that Underwood has never, as far as the Government is aware, publicly acknowledged the true nature of his crimes. Relatedly, the Government notes that Underwood cites as evidence materials that are of no relevance to

13

determining whether or not he has been rehabilitated, for example, letters from "people Mr. Underwood has never met but know him through word of his exceptional reputation" and "an online petition for his release" signed by "80,000 people." (Mot. at 14). Simply put, the Court should not consider these materials, which misstate the record and/or have no bearing on Underwood's claim to have been rehabilitated.

In sum, rehabilitation alone cannot constitute an extraordinary and compelling reason, and, in any event, Underwood has not adequately demonstrated that he has been fully rehabilitated.

### IV. COVID-19 is Not an "Extraordinary and Compelling" Reason for Compassionate Release, and the Defendant Has Not Exhausted His Administrative Remedies

#### A.  Underwood Has Not Exhausted His Administrative Remedies

Underwood previously submitted a petition to the BOP seeking compassionate release on the basis of his alleged rehabilitation and because he might not have received a life sentence under current law. Underwood therefore has exhausted his administrative remedies when it comes to these aspects of the instant motion. Since Underwood's petition to the BOP did not assert the COVID-19 pandemic as a basis for compassionate release, however, he has not exhausted his administrative remedies when it comes to that aspect of his compassionate release motion, and that portion of the Motion must therefore be denied, even without reaching the merits.

Under 18 U.S.C. § 3582(c), a defendant may file a compassionate release request in district court only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment. *Id.* Section 3582(c)(1)(A)'s exhaustion requirement is thus mandatory. It is

critical, in this context, to note that § 3582(c)'s exhaustion requirement is statutory, and thus is not the sort of judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). By significant contrast, statutory exhaustion requirements "stand[] on a different footing." *Id.* There, "Congress sets the rules–and courts have a role in creating exceptions only if Congress wants them to." *Id.* Thus, where a statute contains mandatory exhaustion language, the only permissible exceptions are those contained in the statute. *Id.*; *see also Bastek v. Fed. Crop. Ins.*, 145 F.3d 90, 94 (2d Cir. 1998) ("Faced with unambiguous statutory language requiring exhaustion of administrative remedies, we are not free to rewrite the statutory text.").

As described above, § 3582(c)(1)(A) contains mandatory exhaustion language with no statutory exceptions. The plain language of the statute makes clear that a court "may not" modify a sentence unless, as relevant here, the defendant has first "fully exhausted all administrative rights" or waited 30 days after transmitting his request to the warden. Unlike the Prison Litigation Reform Act, for example, there is no statutory qualifier that a defendant need only exhaust all "available" remedies.[8] Thus, § 3582(c)(1)(A) is a mandatory exhaustion provision with no applicable exceptions. *Cf. Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 750 (2017) (statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims). For this reason, as Judge Cote has explained, this court lacks the authority to grant the defendant's motion at this time. *United States v. Monzon*, 99 Cr. 157 (DLC), 2020 WL 550220, at *2 (S.D.N.Y. Feb. 4, 2020). Over the last few months,

---

[8] In particular, the PLRA demands that an inmate exhaust "such administrative remedies as are available," meaning that the only permissible exception to exhaustion is where the remedies are "unavailable." *Ross*, 136 S. Ct. at 1856-58 (emphasis added); *see also id.* at 1855 (criticizing the "freewheeling approach" adopted by some courts of appeals to exhaustion requirements, and overruling precedent from the Second Circuit and other circuits that had read additional exceptions into the rule). Here, no such exception exists in the statute.

numerous defendants around the country have cited the unusual circumstances presented by COVID-19 as a basis for compassionate release, and have argued that the exhaustion requirement should be excused. The only court of appeals to have addressed the question has rejected the argument and required exhaustion. *See United States v. Raia*, 954 F.3d 594 (3d Cir. 2020). In *Raia*, the Third Circuit recognized the serious concerns presented by COVID-19, but held that, in light of these concerns, as well as the BOP's statutory role and its "extensive and professional efforts to curtail the virus's spread, . . . strict compliance with Section 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at *2. The vast majority of district courts have also required exhaustion despite COVID-19 claims.[9] These decisions are consistent with the plain language of Section 3582(c).

To be sure, COVID-19 presents unusual circumstances, in which compassionate release decisions should be made expeditiously. But the text of § 3582 contains no exigency exception for such circumstances, and indeed the text affirmatively refutes the availability of such an exception in two respects. First, while many statutory exhaustion provisions require exhaustion

---

[9] *See, e.g.*, *United States v. Ogarro*, 18 Cr. 373 (RJS) (dkt. 666) (S.D.N.Y. Apr. 14, 2020); *United States v. Engleson*, 13 Cr. 340 (RJS), 2020 WL 1821797, at *1 (S.D.N.Y. Apr. 10, 2020); *United States v. Gentille*, 19 Cr. 590 (KPF), 2020 WL 1814158, at *3 (S.D.N.Y. Apr. 9, 2020); *United States, v. Roberts*, 18 Cr. 528 (JMF), 2020 WL 1700032, at *2 (S.D.N.Y. Apr. 8, 2020); *United States v. Ramos*, 14 Cr. 484 (LGS), 2020 WL 1685812, at *1 (S.D.N.Y. Apr. 7, 2020); *United States v. Woodson*, 18 Cr. 845 (PKC), 2020 WL 1673253, at *4 (S.D.N.Y. Apr. 6, 2020); *United States v. Hernandez*, 18 Cr. 834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020); *United States v. Cohen*, 18 Cr. 602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020); *United States v. Carver*, 19 Cr. 6044, 2020 WL 1604968, at *1 (E.D. Wa. Apr. 1, 2020); *United States v. Clark*, 17 Cr. 85 (SDD), 2020 WL 1557397, at *3 (M.D. La. Apr. 1, 2020); *United States v. Williams*, 15 Cr. 646, 2020 WL 1506222, at *1 (D. Md. Mar. 30, 2020); *United States v. Garza*, 18 Cr. 1745, 2020 WL 1485782, at *1 (S.D. Cal. Mar. 27, 2020); *United States v. Zywotko*, 19 Cr. 113, 2020 WL 1492900, at *1 (M.D. Fla. Mar. 27, 2020); *United States v. Eberhart*, 13 Cr. 313 (PJH), 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020); *United States v. Gileno*, 19 Cr. 161, 2020 WL 1307108, *3 (D. Conn. Mar. 19, 2020). *But see United States v. Haney*, 19 Cr. 541 (JSR), 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020); *United States v. Perez*, 17 Cr. 513 (AT), 2020 WL 1546422, at *3 (S.D.N.Y. Apr. 1, 2020); *United States v. Colvin*, 19 Cr. 179 (JBA), 2020 WL 1613943, at *2 (D. Conn. Apr. 2, 2020).

of all administrative remedies before a claim is brought in court, § 3582 provides an alternative: exhaustion of all administrative rights or the lapse of 30 days from the warden's receipt of the inmate's request for compassionate release, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).

This alternative suggests that the Congress recognized that even if compassionate release requests cannot always await the full administrative process to be completed, the BOP should have at least 30 days to act on such a request. Second, in cases presenting the most urgent circumstance–inmates diagnosed with a terminal illness–§ 3582(d) requires the BOP to process any application for compassionate release in 14 days. That the Congress allowed 14 days to process the claims of even a terminally ill inmate suggests that it could not have intended to allow a shorter period–which excusing exhaustion would provide–in a case, such as this, where the risk to the inmate, while serious, remains potential.

As the Third Circuit properly recognized, the mandatory exhaustion requirement accommodates the valuable role that the BOP plays in the compassionate release process. Informed decisions about compassionate release require the collection of information, like disciplinary records and medical history, that the BOP is uniquely suited to obtain and which will benefit both the BOP and later the court evaluating such claims. The BOP is also well situated to make relative judgments about the merits of compassionate release petitions—particularly at a time like this when many inmates are making petitions advancing similar claims—and adjudicate those positions in a consistent manner. The Court may of course review those judgments, but the Congress expressed its clear intent that such review would come second, with the benefit of the BOP's initial assessment.

Here, § 3582(c) required Underwood to exhaust administrative remedies before seeking compassionate release in district court. Although Underwood summarily states that he "exhausted all administrative appeals," he did *not* administratively seek relief from the BOP on

the basis of COVID-19. (Mot. at 13). There is no exigency exception to that requirement, and the Court must therefore dismiss his petition as it relates to COVID-19 for failure to exhaust.

**B.  The Defendant is Not at Substantially Greater Risk of Contracting COVID-19 at FCI Fairton**

Even if the Court were to consider Underwood's argument with respect to COVID-19 on its merits, that aspect of the Motion should be denied. COVID-19 is undoubtedly serious, and the Government is sensitive to the health concerns at stake. After careful consideration of the facts of this case, however, the Government submits that the COVID-19 pandemic does not constitute compelling and extraordinary circumstances warranting the immediate release of Underwood.

*First*, the BOP has made and continues to make significant efforts to respond to the threat posed by COVID-19. Beginning in January 2020, the BOP began to plan for COVID-19 to ensure the health and safety of inmates and BOP personnel. *See* Federal Bureau of Prisons COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_covid-19.jsp. As part of its Phase One response to COVID-19, BOP began to study "where the infection was occurring and best practices to mitigate transmission." *Id.* In addition, BOP assembled "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the WHO, the CDC, the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President." *Id.*

On March 13, 2020, in coordination with the Department of Justice and the White House, the BOP implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.*

18

On March 18, 2020, BOP implemented Phase Three of its response, which involved the inventory and stockpiling of cleaning, sanitation, and medical supplies, as well as the maximization of telework by employees. *See* BOP Update on COVID-19, https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf.

BOP implemented Phase Four on March 26, 2020. *See* COVID-19 Action Plan: Phase Five, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. As part of Phase Four, BOP screened all newly admitted inmates with a temperature check and a screening tool. Asymptomatic new inmates were placed in quarantine for at least 14 days, and symptomatic inmates were placed in isolation until they tested negative for COVID-19 or were cleared by medical staff as meeting CDC criteria for release from isolation.

Effective April 1, 2020, BOP began Phase Five of its COVID-19 response, which entailed: (a) securing inmates in every institution to their assigned cells/quarters for a 14-day period to decrease the spread of the virus; (b) to the extent practicable, offering inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education; (c) coordinating with the United States Marshals Service to significantly decrease incoming movement; (d) preparing to reevaluate after 14 days and make a decision as to whether or not to return to modified operations; and (e) affording limited group gathering to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access. *Id.*

On April 13, 2020, the BOP implemented Phase Six, which entailed further preparation for subsequent waves of COVID-19 and included an extension of the April 1, 2020 action plan through May 18, 2020. Bureau of Prisons COVID-19 Action Plan: Phase Six, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf.

On April 23, 2020, the BOP announced that it had it had expanded its capacity for rapid COVID-19 testing, *see* Bureau of Prison Expands COVID-19 Testing, https://www.bop.gov/

19

resources/news/pdfs/20200423_press_release_covid19_testing.pdf, and on May 7, 2020, BOP announced further testing expansion, *see* Bureau of Prisons to Expand Rapid Testing Capabilities, https://www.bop.gov/resources/news/pdfs/20200507_press_release_expanding_ rapid_testing.pdf.

Finally, on May 18, 2020, the BOP implemented Phase Seven, which extends all measures from Phase 6 through June 30, 2020. *See* COVID-19 Action Plan: Phase Seven https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp.

As a result of the BOP's efforts, *zero inmates* and only two staff members at FCI Fairton have tested positive for COVID-19.[10] These and other steps belie any suggestion that the BOP is failing to address the risk posed by COVID-19 to inmates. (Mot. 16-21). Instead, they show that the BOP has taken the threat seriously, has taken steps to mitigate it, and continues to update its policies and procedures.

*Second*, Underwood does not face a substantially greater risk of contracting of COVID-19 at FCI Fairton than he would in the outside world. The Government recognizes that Underwood, at 66 years old, is "65 or older" and therefore has a "higher risk" profile. *See* CDC Coronavirus Disease 2019 (COVID-19), People Who Need Extra Precautions, Groups at Higher Risk for Severe Illness, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Apart from his age, however Underwood does not identify *any* other characteristics or medical conditions putting him at higher risk of contracting or suffering severe complications of COVID-19. Particularly given Underwood's low risk of contracting COVID-19, discussed below, Underwood's age does not rise to the level of extraordinary and compelling circumstances. *See United States v. Haney*, No. 19 Cr. 541 (JSR),

---

[10] As of the time of filing, the BOP's COVID-19 tracking website does not list FCI Fairton as a facility with any confirmed cases of COVID-19 among its inmates. *See* https://www.bop.gov /coronavirus/.

2020 WL 1821988, at *5 (S.D.N.Y. Apr. 13, 2020) ("But if Haney's age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention, a result that does not remotely comply with the limited scope of compassionate release and that would arguably have a devastating effect on a national community that is now itself so under stress.").

Moreover, any risk factors for becoming ill from COVID-19 must be assessed in conjunction with the risk of contracting the virus in prison versus in the population at large. Regardless of Underwood's risk profile, he has failed to establish, at this time and in this particular case, that he is significantly more likely to contract COVID-19 at FCI Fairton, which has seen no inmate infections, than he would be in the outside world.

And, as described above, the BOP has taken significant steps to limit the spread of coronavirus in its facilities. Underwood has put forward generalized arguments about increased risk of contracting COVID-19 in prisons, but those arguments have not been borne out by the actual number of cases at the prison in which Underwood is incarcerated. And, in contrast to the extensive steps taken by the BOP to reduce the risk of transmission, Underwood does not state what he would do to limit his chances of contracting the disease if released.[11] *See Weeks*, 16 Cr. 167 (LAP), 2020 WL 1862634, at *3 (denying compassionate release for inmate with no medical conditions who was housed at FCI Fairton, noting defendant "also has not explained how he would be safer outside of prison at his partner's home in New York City, where authorities could not enforce isolation and quarantines, than in prison, where FCI Fairton, through strict adherence to safety measures, has managed to keep its COVID-19 rate below that of New York City."). For the foregoing reasons, Underwood's arguments premised on the COVID-19 pandemic fail.

---

[11] If the Court grants Underwood's motion, however, the Government requests that the Court order a 14-day quarantine period and medical clearance prior to release to minimize the possibility of any spread of COVID-19 from Underwood to the public.

**V.    The Defendant's Sentencing Arguments Are Unavailing**

Underwood's arguments regarding his sentence are equally unavailing–either standing alone or considered together in conjunction with his other arguments–to justify a reduction of his mandatory life sentence.

*First*, these arguments rehash alleged legal errors or other wrongs that could have been raised in other proceedings and are simply not the type of profound changes in circumstances that could properly be considered "extraordinary and compelling." *See Lisi*, 2020 WL 881994, at \*4 ("Although the Court has the discretion to determine what qualifies as an extraordinary and compelling reason, the Court believes that it would be both improper and inconsistent with the First Step Act to allow [the defendant] to use 18 U.S.C. § 3582(c)(1)(A) as a vehicle for claiming legal wrongs, instead of following the normal methods of a direct appeal or a habeas petition."); *United States v. Rivernider*, 10 Cr. 222 (RNC), 2020 WL 597393, at \*4 (D. Conn. Feb. 7, 2020) ("[N]obody has suggested that the 'extraordinary and compelling' standard can be satisfied by claims of legal error or other alleged wrongs that are cognizable on direct appeal from a conviction or by means of a habeas corpus petition.").

*Second*, Underwood's argument, relying on *Booker*[12] and Amendment 782 to the Sentencing Guidelines, that if he were sentenced today, he "very well may not have received a life sentence," is entirely speculative. (Mot. at 14). As evidence, Underwood points to the fact that, if he were re-sentenced on only the CCE count today, the current Sentencing Guidelines would no longer recommend a life sentence. (*Id.* at 15-16). However, if Underwood were convicted of the same crimes today, rather than in 1990, he would face a maximum penalty of life imprisonment

---

[12] As Underwood concedes, the Second Circuit has repeatedly ruled that *Booker* does not apply retroactively to sentences which were final before *Booker* was decided. *See Green v. United States*, 397 F.3d 101, 103 (2d Cir. 2005); *Guzman v. United States*, 404 F.3d 139, 144 (2d Cir. 2005).

on all four counts of conviction. And, in light of the factors set forth in § 3553(a), including the seriousness of Underwood's conduct and the need to protect the public, a life sentence would be as warranted today as the day it was imposed.[13] In sum, Underwood cannot attempt to claim the benefit of the lower statutory maximum penalties that were in place when he was sentenced, while also getting the benefit of the modern Sentencing Guidelines.[14]

For the foregoing reasons, Underwood has not identified any "extraordinary and compelling" reason cognizable under statute or the Sentencing Commission's binding policy statement.

### VI. The Defendant Remains a Danger to the Community

Even if the Court finds that "extraordinary and compelling reasons" warrant a reduction of Underwood's sentence, it cannot grant one unless it determines that the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" U.S.S.G § 1B1.13(2). Section 3142(g) directs the Court to consider (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any

---

[13] Citing *Apprendi*, 530 U.S. at 477, Underwood appears to argue that the racketeering predicate acts should not be used in calculating his guidelines range because the jury rendered a general verdict, rather than a special verdict. (Mot. at 15 n.3). To the extent that Underwood implies that there was any doubt as to his commission of the predicate acts alleged in the Indictment, at Underwood's sentencing, Judge Cederbaum issued a finding that "those acts were proven at the trial over which [she] presided and where [she] heard all the evidence." (Ex. R, Sent. Tr. 7:20-23). Furthermore, it was the Government who sought a special verdict and Underwood who waived his entitlement to it as a matter of trial strategy. (*Id.* at Tr. 5:15-20); *see also United States v. Applins*, 637 F.3d 59, 83 (2d Cir. 2011) (stating that, while the Second Circuit has expressed a preference for special verdicts in particularly complex criminal cases, it is not required.). Having *opposed* a special verdict, Underwood should not now benefit from its absence.

[14] Nor is there any reason to believe that Judge Cederbaum would have imposed a different sentence if she had not been constrained by the Sentencing Guidelines. As Judge Cederbaum stated at Underwood's sentencing, "If life imprisonment is an available penalty, *it is appropriate in this case*." (Ex. R, Sent. Tr. 24:25-25:1) (emphasis added).

person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

Underwood does not acknowledge this required step in the analysis, and each of the § 3142(g)

factors counsels heavily in favor of a life sentence.

The nature and circumstances of the offenses of conviction are serious. Underwood ran a

notorious narcotics enterprise whose drugs ravaged the community, as Judge Cederbaum

recognized at Underwood's sentencing:

> [T]here is great tragedy here, but the tragedy is that with the ability that you had,
> William Underwood, to move away from the temptations of crime, you
> nevertheless persisted in engaging in what has become a disease in our society, and
> your children and the children of everyone else in the community are the ones who
> are affected by the constant increase in the drug trade in this country, by the endless
> scourge of drugs which has had terrible effects in all sorts of ways on too many
> people in our society.

(Ex. R, Sent. Tr. 27:13-21). Underwood's role in the organization also cannot be overstated. He

formed the Vigilantes and served as its overall leader for approximately seventeen years, up until

his arrest. The lengths to which Underwood went to protect and promote the Vigilantes–including

having rival drug dealers and individuals perceived as "snitches" murdered–are chilling.

At trial, the weight of the evidence too was overwhelming, consisting of, among other

things, the testimony of several cooperating witnesses, as well as that of law enforcement officers,

and experts, and physical evidence. All told, the Government presented the testimony of more than

50 witnesses and introduced more than 250 exhibits. *See United States v. Underwood*, 932 F.2d

1049, 1051 (2d Cir. 1991).

The history and characteristics of the defendant also counsel against granting his motion.

That Underwood has only two prior convictions, for criminal possession of a weapon in 1973 and

1976, PSR ¶¶ 85-92, is in keeping with his reputation for being exceedingly careful, *see id.* at 17.

Indeed, it was Underwood's caution and cunning that enabled him to evade law enforcement for

nearly two decades. Underwood's claim to be rehabilitated is belied by his failure to grapple with his actual conduct or victims and weighs heavily against granting his Motion.[15]

Perhaps most importantly, were Underwood to be released, he would pose a serious risk of danger to the community. Despite Underwood's age, he appears to be healthy. Given his serious criminal past, there is every reason to believe that he would begin again his life of crime and pose a danger to the safety of the community, if released.

### VII.        Section 3553(a) Counsels Strongly Against Any Reduction in Sentence

Finally, for similar reasons as those stated in Section VI above, the § 3553(a) factors counsel strongly against granting Underwood's Motion. *See* 18 U.S.C. § 3582(c)(1)(A) (requiring Court to conduct a § 3553(a) analysis in considering a compassionate release motion); *United States v. Israel*, 05 Cr. 1039 (CM), 2019 WL 6702522, at *2 (S.D.N.Y. Dec. 9, 2019) (explaining that court confronted with compassionate release motion must "consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances")*; Lisi*, 2020 WL 881994, at *6 (denying motion for compassionate release although "extraordinary and compelling" reason under catchall provision arguably existed—specifically, the medical condition of the defendant's mother—based on § 3553(a) factors because, *inter alia*, the defendant "continues to accept no responsibility for his crimes"). In short, the life sentence that Judge Cederbaum

---

[15] Likewise, during Underwood's allocution at his sentencing hearing in 1990, he did not admit his crimes; rather, he blamed others who "perjure themselves . . . and [can] still be valid witnesses against anybody" and stated that he "grew up in Harlem, you know, and you kind of go with the flow. I think I did a lot more in my life than grow up in Harlem and go with the flow." (Ex. R, Sent. Tr. 17:2-13).

originally imposed appropriately addresses Underwood's serious criminal conduct, and the end of

justice would not be served by releasing him now.[16]

## CONCLUSION

For the foregoing reasons, Underwood's motion to reduce his sentence pursuant to 18

U.S.C. § 3582(c)(1)(A)(i) should be denied.


Dated: New York, New York
       May 22, 2020

                              Respectfully submitted,

                              GEOFFREY S. BERMAN
                              United States Attorney for the
                              Southern District of New York


                    By:    ____/s/_____
                              Kaylan E. Lasky
                              Assistant United States Attorney
                              Tel.: 212-637-2315


cc:    Marc Greenwald, Esq. (via e-mail and ECF)

---

[16] Other courts in this District have found that a § 3553(a) analysis required continued detention, under arguably less serious circumstances. *See, e.g.*, *United States v. Martin*, 18 Cr. 834 (PAE) (S.D.N.Y. April 10, 2020), 2020 WL 1819961 (denying motion for compassionate release for defendant serving 66-month sentence for RICO conviction based, in part, on § 3553(a) evaluation); *United States v. Butler*, 18 Cr. 834 (PAE), 2020 WL 1689778 (S.D.N.Y. Apr. 7, 2020) (denying motion for compassionate release in light of COVID-19 for defendant with asthma and heart condition where defendant was a danger to safety of others and had only served 15 months of 60 month sentence); *United States v. Credidio*, 19 Cr. 111 (PAE) (S.D.N.Y. March 30, 2020), Dkt. 62 (denying motion for compassionate release and reduction of sentence to home confinement in light of COVID-19 pandemic for 72-year old defendant sentenced in Feb. 2020 to 33 months' imprisonment because lengthy term of imprisonment was required for reasons given at sentencing).